Filed 2/24/15  In re A.M. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re A.M., et al. Persons Coming Under the Juvenile Court Law. | B256845<br>(Los Angeles County<br>Super. Ct. No. DK00522) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RIGOBERTO U.,<br><br>    Defendant and Appellant. | |

        APPEAL from an order of the Superior Court of Los Angeles County, Carlos E. Vasquez, Judge.  Affirmed.

        Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant.

        Richard D. Weiss, Acting County Counsel, Dawyn R. Harrison, Assistant County Counsel, and William D. Thetford, Deputy County Counsel, for Plaintiff and Respondent.

Rigoberto U. (Father) appeals from the juvenile court's jurisdictional and disposition orders regarding his 11-year-old daughter, K.U. The court assumed jurisdiction over K.U. after finding that Father sexually abused K.U.'s half sister, A.M., by fondling A.M.'s vagina over her clothes on two occasions between seven and nine years earlier.[1] The court removed K.U. from Father's custody and placed her with K.U.'s mother (Mother), ordered monitored visits between Father and K.U., and allowed Mother to act as the monitor. Father contends that the jurisdictional findings and disposition orders were not supported by substantial evidence. We disagree and affirm.

## FACTUAL AND PROCEDURAL HISTORY

The family involved in this case consists of Father, Mother, their three children, 11 year-old K.U., 14-year-old Rigoberto U. Jr., and 12-year-old Kevin U., and Mother's 16-year-old daughter, A.M. Manuel M. is A.M.'s father. Mother also has three adult children who did not live with the family at the time of these proceedings: A.M.'s full biological brother M.M. (Alex) and A.M.'s half siblings by another father, Priscilla M. and Christopher M.

**A.     A.M.'s Report of Sexual Abuse to the Pomona Police Department**

On August 11, 2013, Mother and A.M. were engaged in a heated argument, and when Father attempted to intervene, A.M. called him a "Fucking Molester." In the course of that argument A.M. disclosed to Mother that Father had sexually abused her when she was eight to 10 years old by touching her vagina over her clothes on two occasions. Three days later, after another argument with Mother, A.M. called the Pomona Police Department and reported the sexual abuse. An officer was dispatched to

---

[1]     Father does not challenge the court's jurisdictional and disposition orders regarding A.M.

2

investigate, and he interviewed the family members. A.M. stated that the two incidents occurred while the family was driving home from visiting extended family. A.M. was sitting in the front passenger seat of the car, while her half siblings were asleep in the back seat. Father pulled A.M. to his side to be closer to him, put his hand between A.M.'s legs, and began rubbing her vaginal area. Father told A.M. not to tell Mother, and, as a reward for not telling, Father allowed A.M. to steer the car.

Two of the children recalled taking trips to visit extended family around the time of the alleged abuse, and sometimes sleeping in the back seat on the way home. All three of A.M.'s half siblings denied witnessing the incidents of sexual abuse, and they denied being sexually abused or inappropriately touched by Father. Mother stated that she did not believe the allegations.

Father was arrested. He denied A.M.'s allegations. Father stated to the police that he believed A.M. fabricated the allegations because she was upset with Mother, wanted to hurt Mother, and no longer wanted to live in the family household. Father nonetheless admitted that it would be unusual for A.M. to lodge such accusations simply to get away from the household. Father stated that he has some memory loss issues and sometimes cannot remember things that happened. When asked whether he might have forgotten about the incidents of abuse, Father "paused and looked away from [the officer] and stated no[,] that he doesn't believe that this is one of those times." Father did confirm that the family trips to visit extended family corresponded with the timeline of A.M.'s accusations.

The reporting officer notified the Department of Children and Family Services (DCFS) and DCFS took custody of A.M. The charges against Father were dropped, and he was released from jail on August 15, 2013.

B. **DCFS's Initial Interview of the Family**

On August 15, 2013, an emergency response social worker responded to the home and interviewed the family members. Mother stated she had known Father for over 14 years. After Mother was allegedly raped by Manuel M., Father "accepted" her–and her

three oldest children–while she was pregnant with A.M. Mother continued to deny A.M.'s allegations. She said she could not imagine when the alleged abuse could have occurred because Father was never left alone with the children and she was always with Father and the children when they travelled to visit extended family. She praised Father as a "respectable man who doesn't like problems."

Mother believed that A.M. made up the allegations because of jealousy towards her half siblings whose father is present. Mother stated that A.M. was foul-mouthed and always did as she pleased. A.M. had not lived with the family for a two-year period. Mother questioned why A.M. had not disclosed the abuse during that time. Mother reported that at that time A.M. had been voluntarily placed out of the home through DCFS. A.M. first lived with her adult half sibling, Priscilla; next with her biological father, Manuel M.; and finally with a friend, before returning home. Since then, A.M. had been the source of numerous problems: she broke curfew, would not do chores, and would not cook or eat what the family ate. A.M. also spoke badly to Mother. She called Mother a "Bitch," stated that she wished Mother was dead, and told Mother to "shut the fuck up." A.M. directed similar speech toward Father, calling him a "Hermit" because he is always in his bedroom, and telling him, "fucker, go to your room." Mother said she was tired of this treatment and did not want A.M. to return home.

K.U. denied sexual and physical abuse, denied being afraid of anyone in the home, and denied any mental health issues, substance abuse, or domestic violence in the home. She said the only person who fights in the home is A.M., whom she described as "bad," and always saying "f-you" and calling Mother the "b-word." K.U. said A.M.'s accusations were not true, that Mother always accompanied them on their trips to visit extended family, and that A.M. never sat in the front seat with Father by herself. K.U.'s two brothers similarly stated that they believed A.M. was lying, that they did not believe Father would have sexually molested A.M., and that Father had never touched them inappropriately.

4

The social worker also interviewed the children's maternal aunt, who resided in the household. She stated that Father is a "good man," never causes drama in the family, and is very reserved. She further stated that A.M. will complain if she cannot have her way and that she always refers to Mother as "whore" and "bitch." The aunt believed that A.M. made up the allegations out of vengeance toward Mother. She also recalled that A.M. had told Mother that she (A.M.) would have the children removed and that Father would be going to jail, which is exactly what happened. The aunt claimed that A.M. is a very smart girl who knows exactly what she's doing.

The social worker interviewed A.M. at the police station. A.M. stated that she was between eight and 10 years old when Father "touched her 'crotch' over her clothes." She said he "wiggled his cupped hand over her crotch." She stated that the first incident occurred when she was alone with Father in his car near their home. Her description of the second incident largely mirrored what she had reported to the police. When returning home from a visit with extended family, A.M. sat in the passenger seat next to Father, who was driving, while the other children were asleep in the back seat. Father then "touched her crotch over her clothes," and told A.M. not to tell Mother and he would let her steer the car.

A.M. stated that she never planned to tell Mother about the abuse because Mother would not believe her and she wanted to avoid the involvement of law enforcement and keep her siblings from "growing up without a dad," like she had. A.M. claimed she told Mother about the incidents out of anger. A.M. explained that she does not get along with Mother and that she does not like her home, where she has no privacy. She said she sleeps on the couch in the living room and stores her things in a dresser in the living room. A.M. denied that Father did anything to her besides touch her during the two reported incidents, and she claimed to have no knowledge of him inappropriately touching the other children. She added that the other children are Father's biological children, and she did not think he would hurt them.

5

When the social worker informed A.M. that she could not return home she cried a little, but said she was not surprised. A.M. said she did not wish to reside with her biological father, Manuel M., because he had gotten her in trouble with the police and was too strict and protective. A.M. further claimed she had no relationship with Manuel M. and does not get along with his wife. A.M. added that her adult half sister, Priscilla, had told her that Manuel M. had sexually abused Priscilla when she was a child. A.M. could not believe that Mother had sent her to live with Manuel M., knowing that he had abused Priscilla.

The social worker then interviewed Father in jail. He denied A.M.'s allegations and said he had never inappropriately touched her over or under her clothes or done anything to her that could have been misconstrued as sexual abuse. Father said that he began a romantic relationship with Mother while she was pregnant with A.M. and that A.M. was like a daughter to him. Father explained that A.M. has numerous behavioral problems, that she is always fighting with someone in the home, and that she hates Mother and is very disrespectful towards her.

Father stated that he adores his children and would do anything for them. He said he was willing to move out of the house, if needed, so that the children could remain with Mother. When Father was released the next day, he went to stay at a friend's house.

On August 17, 2013, Manuel M. contacted the social worker and stated that he could not care for A.M. because of her behavioral issues.

C.      **The August 20, 2013 Petition and Detention Hearing**

DCFS filed a petition on August 20, 2013, alleging juvenile court jurisdiction over A.M. under Welfare and Institutions Code section 300, subdivisions (b) and (d), and jurisdiction over the other children under subdivisions (b), (d), and (j).[2] The petition alleged that Father sexually abused A.M. by fondling her vagina, that Mother knew of the sexual abuse and failed to protect her, that Mother excluded A.M. from the home in

---

[2]     All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

6

retaliation for disclosure of the abuse, and that Father's sexual abuse and Mother's failure to protect endangered A.M. and placed all of the children at risk of physical harm, damage, danger, sexual abuse, and failure to protect. The petition also alleged that Mother and Manuel M.'s unwillingness to care for A.M. endangered A.M.'s physical health and safety and placed all of the children at risk of physical harm and damage.

At the initial detention hearing on August 20, 2013, the juvenile court found that a prima facie case had been established. The court removed A.M. from her parents, and placed her in foster care. The court removed the other children from Father, but allowed them to remain in the home with Mother.

**D.     San Bernardino County Sheriff's Department Interviews**

When the San Bernardino County Sheriff's Department learned that one of the incidents of sexual abuse took place in San Bernardino County, it opened a case and interviewed Father, all four children, and A.M.'s adult biological sibling, Alex. During his interview, Father continued to deny A.M.'s accusations. He explained that he was never alone with A.M. because Mother had made it clear when A.M. was a child that Father was not to be alone with her. He also claimed that A.M. never sat in the front seat on any family trip, and he never let her drive the car.

During their interviews, Father's three children made statements consistent with what they had reported to the Pomona Police Department and DCFS during their initial interviews. Alex, A.M.'s adult biological brother, stated that A.M.'s allegations could not be true because he would always sit in the front seat during trips to visit extended family and that he had been awake for all such drives. However, Alex also claimed that while A.M. would lie about "small stuff," he was not sure whether A.M. was telling the truth or not about the molestation.

On October 17, 2013, The Children's Assessment Center conducted a forensic interview of A.M. at the request of the San Bernardino County Sheriff's Department. A.M. related that between the ages of eight and 11 years old, Father "molested" her "two times." With respect to the first incident, A.M. stated that she and Father were driving at

night, alone, in his green Corolla, but she did not remember where they were going. Father asked her if she wanted to drive the car, and she responded by taking off her seatbelt and moving closer to Father so she could reach the steering wheel. She then put both hands on the steering wheel, and while Father's left hand remained on the bottom of the steering wheel, he used the palm of his right hand to touch her vaginal area over her clothes, moving his hand in a back and forth motion.

A.M. related that the second incident took place late at night in the family van. She recounted that Father, her three half siblings, and her brother Alex were all driving home from a visit with extended family. A.M. stated that she sat in the front with Father while the other children slept in the back seat. Father again asked her if she wanted to drive the car, and A.M. again responded by taking off her seat belt and moving closer to Father so that she could put both hands on the steering wheel. While keeping his left hand on the steering wheel, Father used the palm of his right hand to touch her vaginal area on top of her clothes, moving his hand in a back and forth motion. A.M. claimed that Father told her not to tell Mother that he allowed her to drive the car.

A.M. recounted that when she was in sixth grade, after an argument with Father, she threatened to tell Mother about the molestation. Instead, she told Mother that Father let her drive the car. A.M. explained that Mother became upset with Father and told him not to allow A.M. to drive the car anymore. A.M. claimed that she thought about disclosing the abuse to Mother when she was leaving to move in with Manuel M., but she refrained from doing so. A.M. explained that she finally told Mother about the abuse after she became tired of Mother telling her that Father is a "good man" who "has been good to her." When A.M. told Mother about the abuse Mother did not believe her and, at the time of the interview, continued to disbelieve her.

E. **DCFS's Jurisdiction/Disposition Report**

DCFS's October 29, 2013, jurisdiction/disposition report detailed additional family member interviews. Father's three children were consistent in their disbelief of A.M.

8

Mother provided further details of her August 14, 2013, argument with A.M. The argument originated when Mother told A.M. she could not get a tattoo and piercing. A.M. then started "cussing [Mother] out" and said, "hey bitch if I wanted to put your husband in jail I could do it anytime." When A.M. disclosed Father's sexual abuse to her, Mother told A.M. that she should call the police. A.M responded to Mother, saying, "Bitch go to your room, because I'll fucking kill you before the police get here. You don't boss me."

Mother then warned Father that she would kill him if he ever touched her daughter. Father responded by stating that A.M. is his daughter, too.

The children's maternal aunt reiterated that she did not believe the abuse occurred and described A.M. as an incorrigible child.

A.M.'s adult half sister, Priscilla, stated that A.M. had disclosed the abuse to her one week before she told Mother. Priscilla said she did not know whether A.M.'s accusations were true. When Priscilla asked A.M. why she did not disclose the abuse earlier, A.M. expressed a concern that if Mother learned about the abuse, she likely would have left Father, which would have left the family with no income. Priscilla confirmed that Manuel M. had sexually abused her by touching her over her clothes on two occasions. She speculated that A.M. might have heard that story from her and used it against Mother.

A.M.'s adult biological brother, Alex, stated that he did not believe A.M.'s accusations.

DCFS asked the juvenile court to sustain the dependency petition, declare the children dependents, remove A.M. from parental custody and order reunification services, and allow the three other children to remain with Mother with maintenance services for Mother and reunification services and monitored visits for Father.

## F. The Jurisdictional Hearing

A.M., Priscilla, and Mother testified at the jurisdictional hearing. A.M.'s testimony was taken in chambers. She testified that Father sexually abused her on two

9

occasions when she was between the ages of eight and 10 by touching her vagina over her clothes and moving his hand in a swaying back and forth motion. She stated that the first incident occurred near their home, at night, while she was alone in the car with Father. It was the first time she and Father had ever gone on a drive alone together. Father told A.M. to scoot over so that she could drive the car; he then let her put her hands on the steering wheel. At that point, Father touched her for about one minute.

A.M. testified that the second incident occurred in the van while the family was driving home from visiting extended family. A.M.'s older brother, Alex, began the drive in the front passenger seat, but when he got tired and went to the back of the van to sleep, Father called A.M. up to the front. All of A.M.'s siblings were asleep in the back of the van. Father again let A.M. put her hands on the steering wheel to drive, and he again touched her.

When asked whether Father's touching made her uncomfortable, A.M. responded, "[a]t the time, I really wasn't, like, thinking about that. I – like I was thinking about driving, it didn't occur to me." She also testified that at the time of the incidents she did not know that such touching was bad. When asked how the two incidents have affected her relationship with Mother, A.M. responded, "[s]ince I was little, I have always gotten into arguments with her. I have never – like at times we get along, but most of the time, we are always arguing."

A.M. admitted that she was disrespectful towards Mother, would cuss at her, would not follow rules. She also admitted that she threatened to kill Mother. She testified that she did not like living with Mother, but that had nothing to do with her accusations against Father. A.M. claimed she easily could have left the household whenever she wanted.

A.M. stated that she did not tell Mother about the incidents at the time that they happened and waited until August 2013–about seven years after the last incident–because she did not want her siblings to grow up without a father. A.M. testified that she did not disclose the abuse during five months of counseling, which took place several years

10

earlier, because no one would believe her. She later stated that she did not disclose the abuse to her counselor because the subject of the counseling was not the past but her current relationship with Mother. A.M. testified that she eventually disclosed the abuse to Mother because she grew tired of Mother telling her how good Father is and that he had never done anything bad to A.M.

A.M. testified that she told Priscilla about Father's sexual abuse two days before she disclosed the abuse to Mother. According to A.M., Priscilla responded to the disclosure by recalling her own experience of sexual abuse by Manuel M. However, Priscilla testified that she disclosed her own sexual abuse to A.M. three years before A.M. reported being sexually abused by Father. Priscilla also testified that she had lived with Father when she was a little girl, she had never been molested by him, he had never done anything to make her feel uncomfortable, and she has left her own daughter alone with Father since A.M.'s allegations and has had no concerns about doing so.

Mother testified that A.M. disclosed the sexual abuse during an argument over tattoos, and Mother responded by telling her to call the police. Mother also stated that A.M. told her many times before disclosing the abuse that she did not want to live at home. She also testified that she sent A.M. away in August 2013, not because A.M. reported the abuse, but because A.M. threatened to kill Mother and Mother was afraid of her.

At the close of evidence and argument, the court stated that it had listened carefully to A.M.'s testimony and had an opportunity to observe her demeanor and found her "to be a very credible witness." The court found her statements regarding the abuse to be consistent and clear and noted that she was very candid about her problematic relationship with Mother and her behavioral problems.

The court found that the two incidents of sexual abuse to a preadolescent female did not put the 12-year-old and 14-year-old male children at risk, and accordingly struck them from the petition. The court found that Mother had not failed to protect A.M. from the sexual abuse and struck that allegation from the petition as well. The court also found

11

that Mother's refusal to provide care for A.M. did not put any of the siblings at risk.

As to K.U., the court found that, because she is a preadolescent female, the nature of the sexual molestation that occurred put her at risk. The court, accordingly, found that she was a child described by section 300, subdivisions (b), (d), and (j), and sustained the petition, as amended.

The court ordered K.U. removed from Father's custody and placed with Mother, ordered monitored visits between Father and K.U., and allowed Mother to act as monitor. The court also removed A.M. from parental custody and ordered monitored visits for Mother.

Father timely appealed. He challenges only the court's jurisdictional and disposition orders pertaining to K.U.

## DISCUSSION

### A. Standard of Review

At the jurisdictional hearing, the juvenile court's finding that a child is a person described in section 300 must be supported by a preponderance of the evidence. (§ 355, subd. (a); *In re I.J.* (2013) 56 Cal.4th 766, 773.) At the disposition stage, a juvenile court may not remove a child from his or her custodial parent unless there is clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody." (§ 361, subd. (c)(1).)

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.]

12

"We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] '"[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate]."' [Citation.]" (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.)' [Citation.]" (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) "Substantial evidence is evidence that is reasonable, credible, and of solid value. [Citation.]" (*In re Veronica G.* (2007) 157 Cal.App.4th 179, 185.)

**B.      Substantial Evidence Supported the Court's Jurisdictional Findings**

*1.      The Court's Finding that Father Sexually Abused A.M.*

Father consistently has denied that he sexually abused A.M. Nonetheless, he does not challenge on appeal the court's findings that he sexually abused A.M. because he recognizes that a reviewing court may not substitute its assessment of the credibility of a witness in place of the trial court's assessment. "We cannot reject the testimony of a witness that the trier of fact chooses to believe unless the testimony is physically impossible or its falsity is apparent without resorting to inferences or deductions. As part of its task, the trier of fact may believe and accept as true only part of a witness's testimony and disregard the rest. On appeal, we must accept that part of the testimony which supports the judgment. [Citation.]" (*In re Daniel G.* (2004) 120 Cal.App.4th 824, 830.) In other words, we do not disturb the trial court's determination unless it exceeds the bounds of reason. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393.)

Here, although no one else believed her accusations against Father, the court found A.M. "to be a very credible witness" and accepted her allegations of sexual abuse. We are bound by the court's findings that Father fondled A.M.'s vagina over her clothes on two occasions.

13

### 2. *Father's Sexual Abuse of A.M. Puts K.U. at Substantial Risk*

Although there is no evidence in the record that Father sexually abused K.U., Section 300, "does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction." (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) The section 300 subdivisions at issue here–subdivisions (b), (d), and (j)– "require only a 'substantial risk' that the child will be abused or neglected." (*Ibid.*) "The legislatively declared purpose of these provisions 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm.*' (§ 300.2, italics added.) 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' [Citation.]" (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)

The court sustained the dependency petition as to K.U. under section 300, subdivisions (b), (d), and (j). "'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' [Citation.]" (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) Subdivision (j) of section 300 most closely describes the situation regarding K.U., and we accordingly focus on that subdivision.

"Subdivision (j) applies if (1) the child's sibling has been abused or neglected as defined in specified other subdivisions and (2) there is a substantial risk that the child will be abused or neglected as defined in those subdivisions. (§ 300, subd. (j).)" (*In re I.J.*, *supra*, 56 Cal.4th at p. 774.) Here, Father sexually abused K.U.'s half sister as defined in

14

subdivision (d).[3] Because the first requirement is met, only the second requirement is at issue.

"[S]ubdivision (j) includes a list of factors for the court to consider: 'The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child.' (§ 300, subd. (j).) . . . [¶] 'The broad language of subdivision (j) clearly indicates that the trial court is to consider the totality of the circumstances of the child and his or her sibling in determining whether the child is at substantial risk of harm, within the meaning of *any* of the subdivisions enumerated in subdivision (j).' [Citation.]" (*In re I.J.*, *supra*, 56 Cal.4th at p. 774.)

"Among the factors cited in subdivision (j) for the court to consider are the circumstances surrounding, and the nature of, father's sexual abuse of his daughter. By citing these factors, subdivision (j) implies that the more egregious the abuse, the more appropriate for the juvenile court to assume jurisdiction over the siblings. (§ 300, subd. (j).) 'Some risks may be substantial even if they carry a low degree of probability because the magnitude of the harm is potentially great. . . .[¶] . . . [¶] Conversely, a relatively high probability that a very minor harm will occur probably does not involve a "substantial" risk. Thus, in order to determine whether a risk is substantial, the court must consider both the likelihood that harm will occur and the magnitude of potential harm.' [Citation.] In other words, the more severe the type of sibling abuse, the lower the required probability of the child's experiencing such abuse to conclude the child is at

---

[3] Section 300, subdivision, states, "Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: . . . [¶] (d) The child has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by his or her parent or guardian or a member of his or her household, or the parent or guardian has failed to adequately protect the child from sexual abuse when the parent or guardian knew or reasonably should have known that the child was in danger of sexual abuse."

15

a substantial risk of abuse or neglect under section 300.  If the sibling abuse is relatively minor, the court might reasonably find insubstantial a risk the child will be similarly abused; but as the abuse becomes more serious, it becomes more necessary to protect the child from even a relatively low probability of that abuse." (*In re I.J.*, *supra*, 56 Cal.4th at p. 778.)

We must determine whether, under the totality of the circumstances, substantial evidence supports the court's finding that Father's sexual abuse of A.M. creates a substantial risk that K.U. will be abused or neglected.  Father contends that there is no substantial risk that K.U. will be abused because his abuse of A.M. was not severe, prolonged, or egregious; A.M. was not Father's biological child; the abuse occurred between seven and nine years ago; and at the time of the abuse, A.M. was between two and four years younger than K.U. is now.  Although it is a close case, we disagree and hold that the court's finding is supported by substantial evidence.

### a. The Nature of Father's Sexual Abuse

Father contends that the sexual abuse of A.M. is distinguishable from the types of sibling abuse that courts have found create a substantial risk of harm.  We agree that Father's conduct here is not as egregious and aberrant as the conduct described in the cases on which he relies.  (See *In re I.J.*, *supra*, 56 Cal.4th at p. 771 [repeated sexual abuse of teenage daughter over course of three years, including fondling, digital penetration of the child's vagina, oral copulation of the child's vagina, forcing the child to watch pornographic videos, and forcible rape]; *In re Ana C.* (2012) 204 Cal.App.4th 1317, 1320-1323 [sexual abuse of co-habitant's mentally disabled eleven-year-old daughter, including fondling, oral copulation of the child's vagina, vaginal intercourse, and sodomy]; *In re Jordan R.* (2012) 205 Cal.App.4th 111, 137 [sexual abuse of teenage niece, including showing her pornographic videos, requesting a lap dance and oral sex, which the child performed, licking her breasts and genitals, and masturbating in front of her].  Although concededly less shocking than the misconduct in these cases, Father's over-the-clothes fondling of his step-daughter's genitals nonetheless is aberrant sexual

16

behavior and "'constitutes a fundamental betrayal of the appropriate relationship between the generations. . . .'" and "'abandon[ment] and contraven[tion of] the parental role.' [Citations.]" (*In re I.J., supra,* 56 Cal.4th at p. 778.)

We find that the instant case is informed by the decision in *In re P.A.* (2006) 144 Cal.App.4th 1339, cited favorably by the Supreme Court in *In re I.J., supra*, 56 Cal.4th at pp. 775-776. There, the family resided in a one-bedroom apartment, in which the three children shared a bunk bed. The nine-year-old daughter slept on the top bunk and her two younger brothers shared the bottom bunk. (*In re P.A.*, *supra*, 144 Cal.App.4th at p. 1342.) The father and mother slept adjacent to the bunk bed. The daughter reported that after she had gone to bed one night, her father stood over her and began to rub her vaginal area over her clothing.[4] (*Ibid.*) The *In re P.A.* court held that the father's sexual abuse of his nine-year-old daughter– touching her vagina under her clothes and on top of her underwear on one occasion–placed her and her two younger brothers at a substantial risk of harm and sexual abuse. (*Id.* at pp. 1342-43, 1347.)

We find the conduct at issue here to be substantially similar. Father fondled A.M. over her clothes while they were in the car; the father in *In re P.A.* fondled his daughter under her pajamas and over her underwear while standing next to her in bed. While the fondling here occurred over one additional layer of clothing and took place in a car rather than in a bed where sexual misconduct may be more likely to escalate, we find any distinction in this regard to be minor and outweighed by the fact that *In re P.A.* involved opposite-gendered siblings. The *In re P.A.* court found that the father's sexual abuse of his daughter put her two male siblings at risk of abuse, even though there was no indication that the father had sexually abused his sons or had any sexual proclivity towards males. (*In re P.A.*, *supra*, 144 Cal.App.4th at p. 1345.) Given that a father's sexual abuse of his daughter has been found to put her male siblings at risk, the conduct in this case puts A.M.'s female half siblings at an even greater risk. (See *In re Karen R.*

---

[4]     The daughter also reported that a second, similar incident occurred on the following evening, but the petition was amended and sustained regarding only one incident. (*In re P.A.*, *supra*, 144 Cal.App.4th at p. 1343.)

(2001) 95 Cal.App.4th 85, 91.) Indeed, "appellate courts have rarely if ever been faced with a situation in which a father sexually molests one female minor in the household and the juvenile court does not find another female minor in the household to be at risk. The cases cited categorically state that aberrant sexual behavior directed at one child in the household places other children in the household at risk, and this is especially so when both children are females. [Citation.]" (*Los Angeles County Dept. of Children and Family Services v. Superior Court of Los Angeles County* (2013) 215 Cal.App.4th 962, 970.)

Under *In re P.A.*, we find that the nature of Father's sexual abuse was sufficient to support the court's substantial risk finding.

### b. The Sexual Abuse of a Stepdaughter

Father contends that his biological daughter, K.U., was not at risk because his sexual misconduct was directed towards a non-biological child. We disagree. Father began a relationship with Mother when she was pregnant with A.M., raised A.M. from birth, and claimed that A.M. "is like [his] own daughter." Thus, as a factual matter, it does not appear that Father saw A.M. in a different light than his biological children.

Further, courts have rejected the notion that the biological daughter of a man who has sexually abused a stepdaughter is not at risk because of the biological connection. "The juvenile court's distinction between a stepdaughter and a biological daughter is contrary to the holdings and language of the cases that suggest sexual abuse of one child in the household puts at risk other children in the household. As one authority has written, '"Incest," as used herein encompasses not only sexual relations between a child and a biological parent, but also between a child and an adult who has assumed a parenting role towards the child, whether that adult is married or cohabits with the child's parent.' (Wilson, *The Cradle Of Abuse: Evaluating the Danger Posed By A Sexually Predatory Parent To The Victim's Siblings* (2002) 51 Emory L.J. 241, fn. 1.)" (*Los Angeles County Department of Children and Family Services v. Superior Court of Los Angeles County*, *supra*, 215 Cal.App.4th at p. 970.)

18

### c. The Passage of Time and K.U.'s Comparative Age

Father contends that the court erred in finding that K.U. was at risk because the sexual abuse occurred between seven and nine years ago. He also points to the age difference between A.M., who was between eight and 10 years old at the time of the abuse, and K.U., who was nearly 12 years old when the dependency petition was sustained. Again, we disagree. Courts have found children to be at risk of harm despite the passage of similar lengths of time following the abuse of a sibling. (See *In re Joshua J.* (1995) 39 Cal.App.4th 984, 986-987, fn. 2 [father's sexual abuse of his six-month-old son seven years earlier created a risk of abuse to his newborn son]; *In re Dorothy I.* (1984) 162 Cal.App.3d 1154, 1156-57 [jurisdiction over three-year-old daughter based on abuse of half sister beginning at age nine, which occurred over 15 years earlier].) In fact, the court in *Los Angeles County Dept. of Children and Family Services v. Superior Court of Los Angeles County*, *supra*, 215 Cal.App.4th at page 970, expressly rejected the argument that the passage of five to six years since the father's abuse of his stepdaughter–which began when she was seven–reduced the risk to her 10-year-old half sister.

Here, seven years had passed since Father last sexually abused A.M., then age 10. K.U. was 11 years old at the time the petition was filed and sustained. The proximity of the children's ages clearly placed K.U. at risk of similar sexual abuse.

### d. A.M.'s "Suspicious" Allegations

Finally, Father contends–without citation to legal authority–that even though the court found A.M. to be very credible, her allegations were suspicious and those suspicions must be considered as part of the totality of circumstances surrounding the abuse. We disagree. In essence, counsel invites us to give additional weight to a factor the trial court already has considered in evaluating A.M.'s credibility. We will not reweigh the "suspicious" nature of the allegations on appeal. Absent extraordinary circumstances, we cannot reject the testimony of a witness that the trier of fact chooses to believe, and we are bound under the substantial evidence standard of review to accept as

19

true that part of the witness's testimony that supports the judgment. (*In re Daniel G.*, *supra*, 120 Cal.App.4th at p. 830.)

## C.      Substantial Evidence Supported the Court's Dispositional Order

After finding that a child is a person described in section 300 and therefore the proper subject of dependency jurisdiction, the court must determine "the proper disposition to be made of the child." (§ 358, subd. (a).)  A juvenile court presiding over dependency proceedings is empowered to "make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child." (§ 362, subd. (a).)  These orders must be supported by clear and convincing evidence. (§ 361, subd. (c).)  However, a "parent need not be dangerous and the child need not have been actually harmed for removal to be appropriate.  The focus of the statute is on averting harm to the child.  [Citations.]" (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.)

Here, the court ordered K.U. removed from Father's custody and placed with Mother, ordered monitored visits between Father and K.U., and allowed Mother to act as monitor.  Father does not raise any independent issue with regard to this disposition order.  His challenge is predicated entirely on the alleged impropriety of the jurisdictional order.  As discussed above, however, the court's jurisdictional order was supported by substantial evidence, and we hold that the disposition order was as well.

**DISPOSITION**

The order of the juvenile court is affirmed.[5]

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:



EPSTEIN, P. J.



WILLHITE, J.

---

[5]     We note that Father will have opportunities to regain full parental rights over K.U. "'A dependency adjudication is a preliminary step that allows the juvenile court, within specified limits, to assert supervision over the endangered child's care. But it is merely a first step, and the system includes many subsequent safeguards to ensure that parental rights and authority will be restricted only to the extent necessary for the child's safety and welfare.' (*In re Ethan C.* (2012) 54 Cal.4th 610, 617.)" (*In re I.J.*, *supra*, 56 Cal.4th at p. 780.)